

# NUMBER 13-07-00515-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**BERNARD BUECKER, ADMINISTRATOR OF THE
ESTATE OF CHRISTINE WESNER STANDIFER,**                    **Appellant,**

**v.**

**JOSEPH C. ROELL, ET AL.,**                    **Appellees.**

---

### On appeal from the 156th District Court
### of Live Oak County, Texas.

---

# MEMORANDUM OPINION

### Before Justices Yañez, Benavides, and Vela
### Memorandum Opinion by Justice Yañez

By various sub- issues, appellant Bernard Buecker contends the trial court abused its discretion in imposing sanctions against him and in favor of appellee, Joseph C. Roell. Because we conclude the trial court abused its discretion in imposing the sanctions, we reverse the sanctions orders.

## Background[1]

Buecker is an attorney, and Roell is a former physician.[2] On March 2, 2000, Roell's "close personal friend" and patient, Christine Wesner Standifer, died.[3] Several days later, Roell asserted to a court that Standifer had confided her wishes to him regarding the disposition of her estate, and that she had a will naming him executor of her estate. Roell requested, and was granted, permission to search Standifer's home for the will. On June 27, 2000, Roell filed an application to probate Standifer's will, which named him as her personal representative. The will bequeathed: (1) Standifer's real estate and personal property to Roell; (2) her jewelry ("except that given to [her] by [Roell]") to Sandra Gilkerson; (3) $10,000 to Mary Sanders; and (4) $10.00 each to her stepbrother, Michael Gollmer, and her two stepsons.

On August 16, 2000, Buecker, as counsel for Gollmer, filed a plea in intervention challenging Roell's designation as executor.[4] On May 3, 2001, Buecker filed (on Gollmer's behalf) an amended plea in intervention, stating that Roell should not be named as executor because he was being sued by the Texas Medical Board for causing Standifer's death by over-prescribing drugs. On June 28, 2001, the court appointed William L. Hardwick as temporary administrator of Standifer's estate.

---

[1] We rely primarily on appellant's statement of facts. *See* TEX. R. APP. P. 38.1(g) (providing that an appellate court will accept facts as stated in appellant's brief as true unless contradicted by another party). Here, Roell has filed a four-page pro se "Reply" to appellant's brief, which includes several paragraphs entitled, "Facts as I See Them." However, Roell's "facts" primarily challenge Buecker's objectivity and the validity of the findings of the Texas State Board of Medical Examiners, which led to the Board's revocation of Roell's license to practice medicine.

[2] Roell's license to practice medicine was revoked on August 16, 2002.

[3] Standifer was Roell's patient from approximately 1993 until her death in March 2000.

[4] The August 16, 2000 plea in intervention is not included in the record before us.

On August 5, 2001, the Texas State Board of Medical Examiners filed its Second Amended Complaint against Roell, alleging multiple violations of the Medical Practice Act,[5] including allegations that Roell "violat[ed] the standard of care" by unsafely allowing Standifer to self-administer intravenous narcotics and that Standifer "died of a drug overdose." Buecker asserts that on February 28, 2002, he sent a "notice-of-claim" for medical malpractice letter to Roell, with copies to Roell's counsel and Hardwick, the temporary administrator.[6]

On August 16, 2002, the Texas State Board of Medical Examiners issued its final order, by which it revoked Roell's license to practice medicine. The final order consists of twenty-six pages of findings of fact and conclusions of law, which included findings that Roell treated Standifer "with strong, addictive pain medications without adequate medical justification" and that his "long-term treatment of [her] with injectable narcotics caused injection site abscesses [sic]." Buecker received a copy of the Board's order in late September 2002. In late December 2002 , Hardwick resigned as temporary administrator of the estate.

In March 2003, Buecker (on Gollmer's behalf) filed a handwriting analysis report, which concluded that Standifer's purported signature on the will offered for probate by Roell was not genuine.[7] The court appointed Mark Eggert as the second temporary

---

[5] *See* TEX. OCC. CODE ANN. §§ 155.001-167.202 (Vernon 2004 & Supp. 2009).

[6] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.051 (Vernon 2005). Buecker submitted a copy of the letter as a "Supplement" to his "Appendix." However, documents that appear solely in the appendix of a brief are not part of the record and are generally not considered on appeal. *See Till v. Thomas*, 10 S.W.3d 730, 733-34 (Tex. App.–Houston [1st Dist.] 1999, no pet.). Thus, we do not consider the letter on appeal.

[7] The handwriting analysis report, which is included in the record, is dated April 2, 2001. No explanation is provided as to why it was not presented to the court until almost two years later.

3

administrator of the estate. On May 16, 2003, the court appointed Buecker as the third temporary administrator, an appointment which became effective on July 17, 2003, upon the posting of a $10,000.00 bond.

On August 28, 2003, Buecker, as administrator of Standifer's estate, filed a medical negligence claim against Roell. The petition asserted two "exceptions" to the statute of limitations: (1) that Roell's malpractice was not discovered within the statutory period; and (2) that Buecker became aware of Roell's negligence pursuant to the State Board of Medical Examiners' report, but that he lacked the capacity to file suit until he (Buecker) was appointed administrator of Standifer's estate.

On February 9, 2004, Roell filed a traditional motion for summary judgment, arguing that Buecker's suit was time-barred by the two-year statute of limitations.[8] In his motion, Roell argued that Buecker had actual knowledge of the alleged malpractice by May 3, 2001, if not earlier—well within the statutory period. He also argued that Buecker had the capacity "to insist that this malpractice lawsuit be brought within the statutory period."

On April 14, 2004, Buecker filed a response to Roell's motion. In the response, Buecker asserted that he was not a party entitled to sue under section 71.004 of the civil practice and remedies code[9] and that he had no standing to sue until after his appointment as administrator in July 2003.[10] Buecker's response also asserted causes of action for fraud and breach of fiduciary duty, which carry a four-year statute of limitations.

---

[8] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.251 (Vernon 2005).

[9] *See id.* § 71.004 (Vernon 2008) (providing for wrongful death action accruing to surviving spouse, children, and parents of a deceased for their own damages suffered as a result of the death of the decedent).

[10] *See id.* § 71.021 (providing for a survival of cause of action, by which a decedent may have sought recovery for personal injuries, pain and suffering, and other damages suffered prior to his or her death).

On April 19, 2004, Roell filed a brief and reply to Buecker's response, in which he argued that because Buecker failed to file an expert report as required by the medical liability statute, he was entitled to (1) dismissal of the health care liability claim against him, and (2) sanctions consisting of his attorneys' fees and costs in an amount of $7,500.00.[11] On June 18, 2004, the trial court granted Roell's motion for summary judgment as to Buecker's medical malpractice claim on the basis of limitations.

On August 13, 2004, Roell filed a motion for attorneys' fees and costs, again arguing he was entitled to such fees and costs under the medical liability statute. The motion requested $18,500 in attorneys' fees and $508.15 in expenses and interest. Attached to the motion were thirteen pages detailing over 123 hours in legal services rendered to Roell.

On December 16, 2005, Buecker filed a second amended petition, in which he added Nancy McDonald as a defendant, and asserted a claim for conspiracy to commit fraud.[12] On February 8, 2007, Buecker (1) filed a third amended petition, adding a claim for conversion,[13] and (2) non-suited the claims against McDonald.[14] On February 12, 2007, Buecker filed a motion for non-suit of Roell, without prejudice.[15]

On February 16, 2007, the trial court held a hearing on Roell's pending motion for

_____

[11] *See id.* § 74.351(b) (Vernon Supp. 2009).

[12] On April 21, 2003, Nancy McDonald, a nurse formerly employed by Roell, submitted a letter to Mark Eggert, then administrator of Standifer's estate, requesting payment in the amount of $32,611.50 in storage fees for the storage of two boats and an automobile that belonged to the estate. Buecker contends that although he had no authority to do so, Roell ordered the boats and vehicle stored on property that he owned, then claimed to have paid "storage fees," and conspired with McDonald to obtain reimbursement from the estate for payment of such fees.

[13] Buecker alleged that the defendants converted the two boats and vehicle for their own use.

[14] The court granted the estate's non-suit of claims against McDonald on February 16, 2007.

[15] The court granted the motion for non-suit as to Roell on February 12, 2007.

attorneys' fees, even though Roell had been non-suited.[16]   On the same day as the hearing, Roell filed a motion for sanctions, contending that Buecker's pleadings, motions, and other documents were filed in violation of rule 13 of the Texas Rules of Civil Procedure and chapter 10 of the civil practice and remedies code.[17]   At the February 16 hearing, Roell's counsel presented a statement of attorneys' fees incurred by Roell's prior counsel.[18] Roell testified that he had not paid the full amount reflected on the statement, and did not recall what amount he had paid.   Buecker's attorney noted that in 2001, prior to filing suit in 2003, Buecker had filed a copy of the State Board of Medical Examiners' Second Amended Complaint and its Final Order with the probate court.  Roell's counsel argued that he was entitled to $18,500 in attorneys' fees plus expenses because of Buecker's failure to file an expert report under the medical liability statute.  Buecker's counsel argued that (1) the statute was not applicable because Roell was not a physician at the time he was sued, and (2) that the Board of Medical Examiners' final report satisfied the requirement for an expert report.  After advising the parties that he "[couldn't] tell which case was handled more miserably, the case on behalf of the petitioner or the case on behalf of the defendant," the trial court awarded $5,000 in attorneys' fees plus filing fees to Roell solely on the issue of Buecker's failure to produce an expert report in compliance with the medical malpractice statute.[19]

---

[16] In his August 13, 2004 motion for attorneys' fees, Roell's prior counsel requested $18,500 in attorneys' fees and $508.15 in expenses.

[17] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 10.001-.004 (Vernon 2002); TEX. R. CIV. P. 13.

[18] At the time of the hearing, Roell's prior counsel, R. W. Rodriguez, was in jail.  The time sheet reflected fees up to around the time summary judgment was granted in 2004.

[19] The trial court's order ordering Buecker to pay Roell $5,000 in attorneys' fees is dated May 23, 2007.

On May 23, 2007, Roell filed a "Motion for New Trial on Sanctions," in which he argued that the trial court erred in refusing to consider his earlier-filed motions for sanctions. On July 27, 2007, the trial court granted a new trial on the issue of sanctions. On August 23, 2007, Buecker filed a notice of appeal, prior to the new trial hearing on Roell's motion for sanctions.

On October 27, 2007, the trial court held a hearing on Roell's February 16, 2007 motion for sanctions.[20] At the hearing, the following persons testified: Buecker, Roell, R.W. Rodriguez (Roell's prior counsel), and Charles R. Manning (Roell's then-present counsel).

Rodriguez testified that he represented Roell in the medical malpractice suit filed by Buecker. Rodriguez testified that after researching the issue, he told Buecker in December 2003 that the medical malpractice statute had a strict two-year statute of limitations, with no exception for the discovery rule. In Rodriguez's opinion, Buecker added the common-law claims because he knew the trial court likely would grant summary judgment in Roell's favor on the medical malpractice claims on the issue of limitations. Rodriguez did not investigate the fraud and breach of fiduciary duty claims against Roell because the "easiest" way to defend against those claims was to rely on Buecker's failure to respond to discovery requests, including requests for admissions. Rodriguez did not investigate Buecker's conversion claim or Roell's relationship with McDonald because he was relying on the deemed admissions. For the same reason, he did not investigate the claim that there was a lien against the estate for $32,611. Rodriguez testified that his attorneys' fees

---

[20] We note that the Honorable Joel B. Johnson presided over the February 16, 2007 hearing. However, the Honorable Ronald M. Yeager, Senior Retired Judge, presided over the October 27, 2007 hearing.

through June 2004 totaled about $18,500, and that approximately sixty to seventy percent of that amount could have been avoided had Buecker accepted that his suit was barred by limitations.[21]

On cross-examination, Rodriguez admitted that he did not segregate his fees between the medical malpractice claims and the common-law claims. Rodriguez testified that he did not pay too much attention to the report that Standifer's signature on the will was not genuine "because again of the admissions."

Roell testified that Standifer had not told him that she had a will or who her executor was. Roell did not know where the will was prepared; he knew that the two witnesses to the will were his patients, but he had not talked to them about it. Roell testified that he was friends with Standifer and her deceased husband. According to Roell, after Standifer died, her bank called and notified him that he was authorized to write checks on her bank account. The bank sent him a check for around $800.00, which was the balance in the account. Roell testified that because the estate's two boats and vehicle were becoming overgrown with weeds and were being "vandalized," he made arrangements to have those items stored by Robert Buerger. Roell testified that he did not recall any specifics about the storage arrangements. Roell also did not recall whether he had ever requested reimbursement for the $32,611.50 in storage fees. Roell testified that on the day of the February 16, 2007 hearing, Buecker told him that he would "follow [Roell] through the gates of hell" to seek justice for Standifer.

On cross-examination, Roell was shown the motion he submitted to search

---

[21] Rodriguez was later recalled as a witness and testified that he did not know what his fees were from July 2004 through December 2004. He testified that from January 2005 through August 2006, his fees were approximately $15,560.00.

Standifer's house for her will. Roell testified that did not recall the document. Roell conceded that Standifer's will awarded him all of her real estate, but stated that "[Standifer] gave it to me to dispose of." Roell also admitted that the will awards Standifer's jewelry to Sandra Gilkerson, except for the jewelry that he had given to Standifer. Roell did not recall anything about the patients who had witnessed the will. Roell also did not recall anything about how he was supposed to dispose of Standifer's property. According to Roell, he couldn't "recall hardly anything about [the will]."

Manning testified that at his hourly rate of $120.00, his attorneys' fees for working on the sanctions issue amounted to $1,150.00, plus his time spent at the hearing, for a total of around $1,500.00.

Buecker testified that when he filed the medical malpractice action, he believed that there may be two applicable exceptions to the statute of limitations: (1) the one-year delay in filing suit if an executor administrator is appointed and (2) the date-of-discovery exception. Buecker said he learned of the revocation of Roell's license (and the Board's findings regarding Roell's treatment of Standifer) in August 2002. Buecker testified that the filing of the medical malpractice claim against Roell was based on the Board's findings. Buecker testified that before he was appointed administrator, he tried to get the existing administrator of the estate to file the medical negligence action. As soon as Buecker was named administrator, he filed the medical negligence action against Roell. With regard to the basis for the common-law claims, Buecker testified that he knew (1) on the same day that $52,000 was deposited into Standifer's bank account, Roell became the beneficiary of the account and a joint signatory on the account; and (2) the same day that $52,000 was deposited, there was a $5,000 cash withdrawal on the account. Buecker testified that after

9

he became administrator, he received a bill, submitted by Nancy McDonald, for payment of $32,611.50 in "storage fees" for storing the two boats and automobile belonging to the estate.[22] According to Buecker, Roell denied owning the property where the speed boat belonging to the estate was stored, but Buecker later learned that Roell did own the property. Buecker testified that the fraud claim was based in part on the request to the estate for reimbursement of the "storage fees." The breach of fiduciary duty claim was based on Roell's doctor/patient relationship with Standifer and the fact that Roell obtained an interest in her bank account upon her death. The claims against Nancy McDonald were based on the request for reimbursement of the storage fees. The claims for conversion were based on Roell's taking the two boats and automobile without authorization.

Buecker testified that he interviewed the witnesses to Standifer's will. One of the witnesses, interviewed at 10:00 in the morning, told Buecker the will was signed at the clinic; the witness kept asking Buecker for beer. Buecker located the other witness, but was unable to talk to him because he was "shaking" and "looked like he was having a seizure withdrawal or something." Buecker testified that after he submitted the expert report stating that Standifer's signature on the will was non-genuine, Roell withdrew his application to probate the will. Buecker also testified that he learned from the Beeville Police Department that Roell was known in the community as "Dr. Feel Good." Buecker testified that he non-suited the claims after he "got the [estate's] property back."

At the conclusion of the hearing, the trial court gave the parties an opportunity to submit any additional arguments. On February 13, 2008, the trial judge that presided over

---

[22] The storage receipts reflect that the estate's two boats and automobile were stored within about thirty-five days after Standifer's death.

10

the October 27, 2007 hearing held a hearing on the proposed judgment. At the hearing, the trial court explained how it arrived at its order that Buecker should pay Roell $30, 841.00 as sanctions for expenses and attorneys' fees, plus post-judgment interest. The trial court explained that (1) it included the $5,000 awarded on February 16, 2007 in the $30,841.00; and (2) it awarded 60% of $18, 500.00, which is $11,100.00, plus $15,560.00, plus $4,181.00, for a total of $30,841.00.

On March 11, 2008, the trial court signed findings of fact and conclusions of law. Generally, the findings and conclusions included the following: (1) Buecker failed to establish why his medical malpractice claim could not have been filed within the two-year statute of limitations; (2) Buecker's common-law claims were filed outside the applicable statutes of limitations; (3) Buecker's original and amended petitions violated rule 13 and section 10 of the civil practice and remedies code, in that the claims were brought in bad faith and to harass Roell; and (4) the award of $30,841.00 is no more than necessary to satisfy the purpose of rule 215.2 of the rules of civil procedure.

## Standard of Review and Applicable Law

A trial court's imposition of sanctions is reviewed for abuse of discretion.[23] An assessment of sanctions will be reversed only if the trial court acted without reference to any guiding rules and principles, such that its ruling was arbitrary or unreasonable.[24] The trial court does not abuse its discretion if it bases its decision on conflicting evidence and some evidence supports its decision.[25] However, a trial court abuses its discretion when

---

[23] *Unifund CCR Partners v. Villa*, No. 08-1026, 53 Tex. Sup. Ct. J. 57, 2009 Tex. LEXIS 823, at *11 (Tex. Oct. 23, 2009) (citing *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007)).

[24] *Id.* at *11-12.

[25] *Id.* at *12.

11

its decision is contrary to the only permissible view of probative, properly-admitted evidence.[26] Legal sufficiency of the evidence to support the trial court's finding is a factor in deciding whether the trial court abused its discretion.[24]

We examine the entire record and will overturn a trial court's discretionary ruling only if the ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence.[25] In reviewing sanctions orders, the appellate courts are not bound by a trial court's findings of fact and conclusions of law; rather, appellate courts must independently review the entire record to determine whether the trial court abused its discretion.[26] Generally, courts presume that pleadings and other papers are filed in good faith.[27] The party seeking sanctions bears the burden of overcoming this presumption of good faith.[28]

If a sanction order refers to a specific rule, either by citing the rule, tracking its language, or both, we determine whether the sanction is appropriate under that particular rule.[29] Here, the trial court's sanction order specified that Buecker failed to comply with the requirements of rule 13 and chapter 10 of the civil practice and remedies code.[28]

---

[26] *Id.*

[24] *Armstrong v. Collin Co. Bail Bond Bd.*, 233 S.W.3d 57, 62 (Tex. App.–Dallas 2007, no pet.).

[25] *Houtex Ready Mix Concrete & Materials v. Eagle Constr. & Envtl .Servs.*, 226 S.W.3d 514, 522 (Tex. App.–Houston [1st Dist.] 2006, no pet.).

[26] *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006).

[27] *Low*, 221 S.W.3d at 614.

[28] *Id.*

[29] *Houtex*, 226 S.W.3d at 521.

[28] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 10.001; TEX. R. CIV. P. 13.

12

Texas Rule of Civil Procedure 13 authorizes imposition of sanctions against an attorney, a represented party, or both, who file pleadings that are (1) groundless and brought in bad faith, or (2) groundless and brought to harass.[29] When determining whether Rule 13 sanctions are proper, the trial court must examine the facts available to the litigant and the circumstances existing when the litigant filed the pleading.[30] Rule 13 requires sanctions based on the acts or omissions of the represented party or counsel and not merely on the legal merit of the pleading.[31] The trial court must provide notice and hold an evidentiary hearing "to make the necessary factual determinations about the motives and credibility of the person signing the groundless petition."[32] "Groundless" means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law.[33] Bad faith is not simply bad judgment or negligence; rather, it is the conscious doing of a wrong for dishonest, discriminatory, or malicious purposes.[32] Improper motive is an essential element of bad faith.[32] Harassment means that the pleading was intended to annoy, alarm, and abuse another person.[33]

Section 10.004 provides "[a] court that determines that a person has signed a

---

[29] *See* TEX. R. CIV. P. 13; *Parker v. Walton*, 233 S.W.3d 535, 539 (Tex. App.–Houston [14th Dist.] 2007, no pet.).

[30] *Walton*, 233 S.W.3d at 539.

[31] *Id.*

[32] *Id.* (citing *Aldine Indep. Sch. Dist. v. Baty*, 946 S.W.2d 851, 852 (Tex. App.–Houston [14th Dist.] 1997, no writ)).

[33] *See* TEX. R. CIV. P. 13; *Walton*, 233 S.W.3d at 539.

[32] *Walton*, 233 S.W.3d at 539.

[32] *Id.*

[33] *Id.*

pleading or motion in violation of Section 10.001 may impose a sanction on the person, a party represented by the person, or both."[34]  Section 10.001 states that a person signing a motion or pleading certifies that "to the signatory's best knowledge, information, and belief, formed after reasonable inquiry:"  (1) the motion or pleading is not presented for an improper purpose, (2) each legal contention is warranted, (3) each factual contention is likely to have evidentiary support, and (4) each denial of a factual contention is warranted.[35]

To prevail under Chapter 10, there must be little or no basis for the claims, no grounds for legal arguments, misrepresentation of law or facts, or legal action that is sought in bad faith.[36]  "Under Section 10.001, the signer of a pleading or motion certifies that *each* claim, *each* allegation, and *each* denial is based on the signatory's best knowledge, information, and belief, formed after reasonable inquiry."[37]  "The statute dictates that each claim and each allegation be individually evaluated for support."[38]

**Discussion**

The trial court's conclusions of law included, in pertinent part, the following:  (1) that the signing of Buecker's original and amended petitions, asserting that Roell committed medical malpractice, violated rule 13 and section 10.001, in that the assertions were made in bad faith and to harass Roell; (2) that Buecker's claim that the malpractice action was not barred by limitations was brought in bad faith and for harassment, and there was "no

---

[34]  EX. CIV. PRAC. & REM. CODE ANN. § 10.004 .

[35] *Id.* § 10.001.

[36] *Loeffler v. Lytle Indep. Sch. Dist.*, 211 S.W.3d 331, 348 (Tex. App.–San Antonio 2006, pet. denied).

[37] *Low*, 221 S.W.3d at 615 (emphasis in original).

[38] *Id.*

14

basis in existing law" for his contentions regarding limitations; (3) that Buecker's claims that Roell committed fraud and breach of fiduciary duty were brought in bad faith and to harass Roell, and that the claims lacked factual grounds; (4) that Buecker's allegations that the fraud and breach of fiduciary duty claims could not have been discovered within the four-year statutory period were brought in bad faith and without any basis in existing law; and (5) Buecker's claims that Roell conspired with Nancy McDonald to defraud the estate and converted estate property were brought in bad faith and for harassment and "lacked factual grounds." The trial court also concluded that Buecker's legal arguments asserted at the sanctions hearing (1) did "not legally establish that at the time he signed and filed the pleadings," that to the best of his knowledge, information and belief, formed after reasonable inquiry, the pleadings "were not groundless and brought in bad faith or groundless and brought for the purpose of harassment;" and (2) lacked legal merit.

We disagree. As the party moving for sanctions, Roell was required to prove Buecker's subjective state of mind.[39] Here, there was no evidence that Buecker had any improper purpose of harassment or improper motive. At the October 27, 2007, hearing, Buecker's counsel questioned Roell's former counsel, Rodriguez:

> Q [Buecker's counsel]: Did Mr. Buecker indicate to you that he was personally upset with Dr. Roell or that he was bringing this for any purpose other than for a legal determination of the applicable limitations?
>
> A [Rodriguez]: Not at that juncture, no.

---

[39] *See R. M. Dudley Constr. Co. v. Dawson*, 258 S.W.3d 694, 710 (Tex. App.–Waco 2008, pet. filed) (citing *Brozynski v. Kerney*, No. 10-05-300-CV, 2006 Tex. App. LEXIS 6817, at *12-13 (Tex. App.–Waco Aug. 2, 2006, pet. denied) ("The party moving for sanctions must prove the pleading party's subjective state of mind: bad faith does not exist when a party exercises bad judgment or negligence; under Rule 13, bad faith exists only for the conscious doing of a wrong for dishonest, discriminatory, or malicious purposes. Improper motive is an essential element of bad faith for purposes of imposing sanctions for groundless, bad-faith pleadings." (internal citations omitted)).

15

Roell gave the following testimony regarding Buecker's motives:

> Well, I got on the elevator, and the question was brought up why is he [Buecker] doing this and he said basically that the spirit of Christine Standifer had come from the grave and wanted him to seek justice and to that matter he would follow me through the gates of hell until this happened.
>
> . . . .
>
> Q [Roell's counsel]: Okay. Now, Dr. Roell, have you seen any other indications—or let me ask you what other indications you have seen that leaves you to think that this action has been maintained and kept going for so many years to harass you?
>
> A [Roell]: I don't think—my own personal opinion he did not act in good faith. At the results of the mediation he wanted $10,000 legal fees—
>
> . . . .
>
> Q: Beyond that you really can't go into it, but what other evidence do you have or you think supports your view that he was harassing you?
>
> A: Just continuation of paper after paper[,] allegation after allegation[,] some of his remarks in court[,] calling me Dr. Feel Good and some of the other things that he got out of the pleadings of the Texas State Board of Medical Examiners; [he] just really berated me.

Buecker testified that when he filed the petition for medical negligence, he relied on the facts in the report of the State Board of Medical Examiners, which found that Roell had violated the standard of care with regard to several patients, including Standifer. Buecker stated that he had some "legal questions that were not resolved" in his mind, including whether any exceptions to the two-year statute of limitations applied.

Buecker gave the following testimony:

> Q [Buecker's counsel]: You have heard Dr. Roell imply that you had an animus against Dr. Roell and that you had some spiritual connection from Ms. Standifer, the decedent, and as a result of that you were going to pursue Dr. Roell from the gates of hell. Is that what he has testified to ?
>
> A [Buecker]: I heard that testimony.

16

Q: And do you recall based upon his testimony today when Dr. Roell said that you said that?

A: He said I said that at the—when the Court sanctioned me as administrator for $5,000.

Q: And that was on February 16th of 2007?

A: That is when that hearing was held.

Q: And, in fact, did you tell Dr. Roell those words?

A: I wasn't here at that hearing.

Q: Okay. So did you have any personal animus against Dr. Roell before filing the original petition for medical negligence?

A: No.

Q: Or in any of the other pleadings that are alleged as being made subject to these sanctions ordered, including the April 14th, 2004 response to a motion for summary judgment?

A: No.

Q: For the April 14th, 2004 pleadings in which you allege fraud and breach of fiduciary duty?

A: No.

Q: Or the December 16, 2005 pleading joining Nancy McDonald as a defendant in alleging additional claims regarding estate property?

A: No.

Q: Or the February 6th, 2007 pleading in which there was an amended petition in which you added a claim of conversion?

A: No.

. . . .

Q: And at the time that you filed your common law claims and that was after on [sic] April 14th, 2004, December 16th, 2005, February 6th, 2007, when you filed your claims or amendments to the claims[,] did you have a reasonable expectation of prevailing when you filed those petitions?

17

A: Yes.

Q: Why is that?

A: The evidence I had garnered.

Q: And then you dismissed the case; is that correct?

A: Yes.

Q: Why is that?

A: I had obtained the return of the property through my lawsuit with Nancy McDonald. I had established what I needed to establish on the record regarding Dr. Roell's involvement in this thing because he testified at a deposition that he had retrieved the property right after her death with the authority of Mr. Hardwick and had given it to storage. The fact of the matter is Mr. Hardwick was not appointed as administrator until 21 months after he had said he had retrieved the property with the authority of Mr. Hardwick.

I had established the elements that I had looked to establish. I didn't have to pursue it anymore when I got the property back. There is no money in the estate to pay for trials and lawyers to do this thing. I got the property back. I cut my losses, and I got what the object of the suit was to do. I got it done.

Q: So you recovered the property of the estate that you were trying to get recovered from Dr. Roell?

A: Yes.

We conclude that Roell failed to establish Buecker's bad faith—the conscious doing of a wrong for dishonest, discriminatory, or malicious purposes.[40] Similarly, we find no evidence of harassment—that the pleadings were intended to annoy, alarm, and abuse another person.[41] We conclude that Roell failed to overcome the presumption that Buecker's claims, including the medical malpractice claim and the common-law claims,

---

[40] *See Walton*, 233 S.W.3d at 540.

[41] *See id.*

18

were filed in good faith by failing to present any evidence that the claims were groundless and filed in bad faith or to harass.[42]

We note that the May 23, 2007 order ordering Buecker to pay Roell $5,000 in attorney's fees is included in the final order ordering sanctions in the amount of $30,841.00. At the February 13, 2008 hearing on the entry of judgment, the trial court admitted, regarding the $5,000, that he did not "know what Judge Johnson used. I don't know how he arrived at it. I don't know if it's pure sanctions or just an amount of attorneys' fees." We also note that at the February 16, 2007 hearing, when Buecker's counsel objected that "there is no credible evidence as to amount of attorney's fees," the trial court stated, "Now you pulled out your hammer and hit on a nail." At the February 13 hearing, Roell testified that he did not recall what he had actually paid his counsel in attorneys' fees. We conclude that based on the record before us, there is insufficient evidence to support the award of $5,000 in attorneys' fees awarded in the May 23, 2007 sanctions order.

We sustain Buecker's first and third sub-issues.[43] Because we find these issues dispositive, we need not address Buecker's additional issues. We reverse the trial court's May 23, 2007 and February 13, 2008 orders imposing sanctions, and render judgment that Roell take nothing.

_____
LINDA REYNA YAÑEZ,
Justice

Delivered and filed the
24th day of November, 2009.

---

[42] *See id.* at 541.

[43] By his first sub-issue, Buecker contends the trial court abused its discretion in awarding the May 23, 2007 order of sanctions; by his third sub-issue, Buecker contends the trial court abused its discretion in awarding the February 13, 2008 order of sanctions for $30,841.00.